# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 7, 2009 Session

## GEORGIA O'KEEFFE FOUNDATION (MUSEUM) v. FISK UNIVERSITY

**Appeal from the Chancery Court for Davidson County**
**No. 05-2994 III     Ellen Hobbs Lyle, Chancellor**

---

**No. M2008-00723-COA-R3-CV - Filed July 14, 2009**

---

RICHARD H. DINKINS, J., concurring.


I concur in the thorough and well-reasoned opinion authored by Judge Clement and write separately to express considerations I believe should guide the trial court and the parties as they determine the appropriateness and nature of any *cy pres* relief.

As a result of the dismissal of the O'Keeffe Museum and Foundation from this litigation, the question of whether Fisk has breached the conditions attendant to the gift and, if so, the appropriate remedy therefor, is not in issue. Significantly, the record does not show an unwillingness on the part of Fisk to display the art or to honor the purpose of the gift and the conditions set forth by Ms. O'Keeffe. Rather, Fisk's dilemma - and the reason it seeks *cy pres* relief - is based on an inability, due to expense, to maintain and display the collection as originally contemplated by Ms. O'Keeffe and President Johnson.

Alfred Steiglitz, in his will, and Georgia O'Keeffe, by her actions, bestowed this extraordinary collection of art on Fisk University in order to make the collection available to Nashville and the South to promote the study of art. In my view, it is not insignificant that, of the six institutions chosen to house Mr. Steiglitz's photographs and art work, Fisk was the only university and the only institution located in the South designated. In the decades prior to the receipt of Ms. O'Keeffe's generosity, Fisk had gained a reputation as a center of art and music, in addition to its academic reputation. Joe M. Richardson, *A History of Fisk University*, *1865-1946*, (The Univ. of Alabama Press (1980)). Among the factors giving rise to this reputation was Fisk's receipt in 1931 of a collection of 300 pencil sketches and water colors by Cyrus Leroy Baldridge, the renowned murals of Aaron Douglas and the hiring, in 1937, of Aaron Douglas as a member of the faculty at Fisk. *Id.*, pp. 148-49. According to the allegations of the complaint, Fisk converted what was then the University Gymnasium to house the Steiglitz Collection, thereby establishing the first permanent

1

gallery space at the university. The Van Vechten Gallery opened on November 4, 1949, a few months following the New York surrogate court's approval of Ms. O'Keeffe's petition. Gifts from Ms. O'Keeffe's personal collection followed, beginning with the gift of *Calla Lillies* in December 1949. It is reasonable to conclude, therefore, that Ms. O'Keeffe approved of Fisk's response to the immediate challenge of housing and displaying the Steiglitz collection by its establishment of the Van Vechten Gallery and all of her gifts to the university were in recognition of Fisk's growing status as a repository of art and culture.

By the same token, the primary mission of Fisk is education and, as noted previously, it was the only university amongst the donees of Alfred Steiglitz's artwork. Dr. Charles Johnson became president of Fisk in 1947 and served until his death in 1956. Under his leadership, "Fisk built five major buildings, continued to develop an outstanding international faculty . . . and [Fisk] moved into a condition of acceptance for a chapter of Phi Beta Kappa, the American Association of University women, and the Association of Schools of Music." Patrick J. Gilpin and Marybeth Gasman, *Charles S. Johnson: Leadership Beyond the Veil in the Age of Jim Crow*, (State Univ. of N.Y. Press (2003)) p. 225. Not being convinced that desegregation of education would become a reality, Dr. Johnson created an environment in which the faculty, guest speakers and students were integrated and "prominent artists and intellectuals of varying races and nationalities came together to nurture students and encourage scholarship." *Id.* p. 227. In addition to her donation of art to the institution, Ms. O'Keeffe was among a group of "visiting luminaries," including Martin Luther King, Jr., Langston Hughes, Carl Van Vechten, W.E.B. DuBois and Paul Roberson, who donated their time and intellect as participants in Fisk's Basic College program, established by Dr. Johnson "in an effort to provide equal education within the then segregated society . . .". *Id.*, p. 230-31.[1] Dr. Johnson's tenure was also noted for his support for and expansion of the Fisk Race Relations Institute.[2] *Id.*, Chs. 13, 14; Richardson, at 141-42. Ms. O'Keeffe's choice of Fisk to house the collection, consequently, should also be viewed in the context of her recognition, appreciation and support of Fisk's primary mission as educational institution, birthed in the aftermath of slavery to educate newly freed slaves, and its efforts to advance into an uncertain future as a liberal arts institution of national prominence and stature.

The question for the court, the Attorney General and Fisk on remand is what "will most effectively accomplish its general purposes, free from any specific restriction, limitation or direction

---

[1]

"President Johnson founded the Basic College on the principle of individual ability and preparation. His goal was to raise the national standard for liberal arts education and to enrich a student's overall educational process. Further, Johnson aimed to prepare students for graduate study, and to create a nucleus of black intellectual leaders." Gilpin & Gasman, pp. 230.

[2] The role that Fisk played in the early days of the national effort to eradicate *de facto* segregation was multi-faceted and multi-disciplinary. The Race Relations Institute brought to the South, the Nashville community and Fisk campus a wide array of people and organizations seeking to establish not only a new chapter in race relations in America and the world but also "to educate those in a position to make, or at least directly influence, public policy in urban America." Gilpin & Gasman, p. 176. This is an effort that continues today. *See* www.fisk.edu/rri.

contained therein. . . ." N. Y. Est. Powers & Trusts Law § 8-1.1(c). As noted by Judge Clement, there is no indication in her correspondence with Fisk that Ms. O'Keeffe intended to retain a reversionary interest in the art; likewise there is no indication that she did not intend for Fisk to have control over the artwork, subject only to its adherence to the general purpose of the gifts and the conditions imposed relative to its maintenance and display. The financial challenges facing Fisk are not unique and are shared by other educational institutions; there is a significant public interest in keeping and expanding educational opportunities and service even in difficult times. *See generally* www.uncf.org. The trial court noted $17 million in deferred maintenance and other long-term financial challenges that Fisk faced at the time of trial as well as Fisk's recent fund-raising success in response to the Mellon challenge grant. I think it is appropriate, as the court and parties consider the question of *cy pres* relief, that the primary mission of Fisk as an educational institution be weighed as well, and that the extent and manner to which the Steiglitz collection may serve to attract revenue or donors to the university is not an impermissible area of inquiry in addition to issues related to modifying the conditions of maintenance and display of the art in light of the advances in technology as recognized by the trial court.

_____
RICHARD H. DINKINS, JUDGE

3